May you please support my name is Todd Sivia and I represent the California SMAP. One other thing I do want to note in the briefs, for whatever reason, maybe my air, Storey and Storeyland should be one and the same. I think I refer to Mike Storey quite a bit. Mike Storey is the sole owner of Storeyland so please note that. Your brief makes that clear. When you're referring to Storey you're referring essentially to both. I just want to make sure that that's clear. If we look at the facts, we look at 2001. There was an E and a contract that was signed in 2001. We believe that, and I think if you look at the board, there was a valid contract. Can I stop you right there? Sure. Can you explain to me why you would have a contract for deed and then the deed itself delivered? We Or did I misunderstand? There was a written contract. You get the deed before the contract's completed? Yes, that's correct. You get a signed deed from the grantor. We sign the contract and then I believe the day later we sign the deed. Well, you wouldn't sign the deed or your client wouldn't sign the deed because he's the grantee, right? Well, my client, in order to report, correct, correct, grantee. The grantor delivers the deed usually at the completion of the contract. Is that not correct? Correct. Okay. But you're saying that the grantor signed the deed over to your client the day after the contract was signed and executed by both clients, I mean by both the plaintiff and the defendant. Let's call your client the plaintiff and opposing counsel's client the defendant. You're saying that in 2001 when the contract for deed was When the contract for deed was just a deed, so a marked deed, when the contract for deed was a contract and deed, they're two different documents. A contract. A contract for the sale of real estate. Okay, which is a contract for deed, right? What was the contract for? The contract was to sell the property. It gave the firm $25,000. Okay. You pay the $25,000, you get the deed. Okay, and the deed was delivered the next day, is that correct? Next day. So the contract was over with then. What else is there to do? But, and if you look at the timeline, frankly, 2001 to 2004, there was a deed that was signed by Rosemary Stewart. 2004 to 2007, we have litigation between the two parties. And in that litigation, the trial court, and this is a separate cause of action. This is a quiet title action. This is a quiet title action. So 2004 to 2007, you know, we don't dispute that there was a quiet title action. And the quiet title action says that deeds are invalid. And the court says for two reasons. One, the bads, Mr. Stewart, didn't sign the deed. Or under the power of attorney by Rosemary. And the second thing, there was, he didn't, the court found that there was no money that was transferred. So. Let me interrupt you with two questions. When in your timeline was that deed recorded or was it recorded? It was recorded 2007, between 2003 and 2004. But the prior action, the quiet title, Judge Mendelson found that the payments, which your client said were towards the real estate, were actually part of the defendant. I'll use, you know, Justice Bomer's terminology. Were really to repay defendant for her covering of an indemnity of a loan to a bank that was made to the plaintiff. And the defendant covered and plaintiff was actually repaying defendant. Is that correct? That's what the court found. Right. And we're saying. Well, then let me ask you a follow-up question. You're claiming that the warranty deed, whenever it was recorded and however it was signed, was for the sale of this property upon presentment of $25,000. When was $25,000 ever given to the defendant for the sale of the property? To answer that question, we believed in 2001, 2002, that that money was being delivered for the purpose of this transaction. And we believe that from 2001 to 2007, we believed that we were. Did Judge Mendelson specifically find there was no payment and that order was never appealed? That's correct. We're absolutely, you know, up until 2007. Isn't that the law of the case here now? I mean, if that order was never appealed and he's made a judicial finding that there was no payment there, what are we doing here? The reason why we're here is because my client has been in possession from 2001 until 2009. And because we were in possession and we believed from 2001 to 2007 that we were, that we had a valid. You know, we believed that we had a valid deed and the contract was executed. And the contract was executed by Rosemary Story and on behalf of the power attorney of John Story, which is my client's father. So, we have to look at, yes, the deeds were in the ballot, but does it revoke the ballot contract? There is a ballot contract from 2001 until today. You know, the court finds in the trial court that there is a valid contract. My initial question, the initial contract, was that not completed as far as your theory is concerned and done with when the deed was transferred then? What else did the seller have to do then? What did the seller have to do? When your client received the deed from his stepmother, the contract was over with, right? It was completed. But if you invalidate the deed, you don't invalidate the contract. Years later. Years later. We have ten years from the date of entering into the contract. And this is my argument with the statute, you know, and where I differ between Mr. Larson. I believe that, you know, I have statute of limitations, which is ten years, and latches don't apply in this case as well. And we've shown in this court that, you know, latches – that, you know, we were correct in applying the law of latches. In 2001, you know, we were lulled into the belief that we had a valid contract and that we were – we had completed everything. There was never demand for payment of the $25,000. Once we found out, the day after we found out that we didn't pay for it, we turned around and said, we want to close. There's no question. You know, we believe that we, you know, we will – we're willing to pay the $25,000. So the day after the judgment hits, we're out there. We send a certified letter saying we want to close. And so, you know, the court has to look at – if we look at – if we look at the non-tender issue, all I have to prove, and I believe that Kelly agrees with me, that I petitioned the court to say that we were ready, willing, and able to perform. There was nothing – no questions of my client saying that he could not perform, that he didn't have money. There was no request for assurances that he could – that he, you know, that there was any way that he could not perform this contract. You know, we believe – you know, my client – Judge Mendelson in 2007 ruled there was no enforceable contract, though, correct? No, no. He didn't? No. Judge Mendelson did not – it's actually in the ruling. He said, I don't make any ruling on the validity of this contract. He said, that's not what's before me. And, you know, it's my belief that if you do rule that there was an issue with Mendelson's ruling in 2004, that it's probably an error on the attorney for not filing a counterclaim at that point in time. Let me just ask a question. If you've got a quiet title action and you're trying to remove all the clouds of the title for the property – well, let me ask this. Was the contract recorded? Was the contract recorded? The contract was not recorded. Because of the deed? I mean, because – my question is, I mean, how do you validate the deed and don't do anything about the contract if you're trying to – That's one – If it's not recorded, I guess it's not a cloud on the title. You're on – yeah, it's not a cloud on the title. It's a valid contract. And I believe I can enforce that contract. If your client breached the contract by making payments that a court subsequently found were for a loan, a different transaction than for the contract. If there was a breach of the contract? By your client. I don't believe there – in my view, I don't believe he breached the contract. And because he believed – he reasonably believed that he had paid this contract off. Well, at least we can agree on the judgmentals and said that wasn't the case. That's correct. That's correct. There is no – you know, in 2007, we agreed. You know, we didn't appeal it at that point in time. So no payments were made to the grantor at that time? At that point in time. Up until that date, because the only question before the court in that cause of action was in the client title action. There was nothing else. So the only question that the court had was were the deeds valid? And if the deeds are not valid, then we don't have – and if you look at some of my things that I addressed before the court in the memorandum, I talked about merger. Merger doesn't apply because if the deeds are invalid, we don't fold the contract and the deed into one and the same. So merger doesn't apply. So we have – we're left with – so if the deeds are invalid, we're left with a contract. And the contracts – you know, and the court says we have a valid contract. Judge Harrison in his ruling says we have a valid contract. The Pelley says we have a valid contract. I think the two distinctions or two issues that the Pelley would have is timeliness and non-timeliness. Timeliness and? Non-tender or non-tender. I think those are – if we narrow down all the issues, it's – I believe it's down to timeliness and non-tender. If we – on timeliness, the court – we have to look at – you know, if we look at Bandon Building Corporation, one cannot justify a recordably low-level adversary into a false sense of security, causing him to subject his claim to bar of the statute and then flee the very delay of a course of conduct. So we can't say that because of his delay, you know, there was no demand ever made from the Pelley that – to make payments or that the payments wasn't sufficient. There was nothing pleading in the 2004 case, and it wasn't until we filed this other clause of action that they say that we are – we failed to pay. So between 2001 – or we believe that we were basically – because he had possession of the property, you know, there's no question that he had possession. So between 2001 and 2009 when the – We all would agree that the contract did not have a date certain by which it was completed. Correct. And therefore, can we assume that the court must establish a reasonable time limit? That's correct. There's no question. And the court made a factual finding that it was unreasonable in this case. Is that correct? And that's – that is my issue. Do you think that it was unreasonable for the court to make that finding that it was unreasonable? I don't – yeah, I believe that it was unreasonable for the court. And the reason – and the whole reason why I believe that is between 2001 and 2007 we were lulled into the belief that we had paid for it. We had a deed. The deed was recorded. Yes, we did not get that second signature, but Mrs. Story had the forethought in the contract to sign her name and sign on behalf of the power of attorney for her husband. So yes, the deeds are invalid, but we still have the contract. And if he has possession between 2001 up until 2009, there's a reasonable expectation that – and there's no eviction. There's nothing. And it's important to note that in 2003, father dies. So in 2000 – so he has possession. There's an ability for him to – if they wanted to say that the contract was invalid, why didn't you file it before then? Did your client know about the mortgage that the defendant signed for the – wasn't there something there about a couple hundred thousand dollar loan or something? That the defendant or the stepmother signed a mortgage for, right? Or the property that your client now claims he owns was being mortgaged by some other person? It was mortgaged by Rowe Fair. Right. To pay off – there it is. And when did that take place? That took place in November. The contract was signed in August. November 2001? 2001. So the contract was signed in August. So evidently your client either knew or should have known that he didn't have clear title to the property then. You're saying he was lulled in for this six or seven year period. If there's a subsequent mortgage by somebody who purportedly just signed over the property to you, that ought to be a red flag, should it not? I don't know. So – I understand your point.  Okay. If we look at – if the court says – if we look at the non-tender issue – am I – if we look at the non-tender issue, what would be the results? If the court came out and said you have to – if we follow what Judge Harrison says. And Judge Harrison says, show me the money. And he makes the big point of quoting Jeremy Dwyer. The detrimental policy effect of this will be great because you can't – that would mean if the court says you have to show them the money before you close on this contract, that would require everybody in the real estate industry to produce the money up front. We're not – we believe we would not allow the – doesn't allow for us to obtain the mortgage or anything just like that. So I believe the policy, for the non-tender issue, definitely would be an unjust result. If we look at the timeliness, again, we believe that we were molded to the idea that this contract was – that we had successfully entered into this contract and that we didn't have fees. There was assurance – I know what my client says. Honestly, I can't tell you from the record what my client said. So I can't go into the details. So I ask that you review the record. We will do that. Thank you, counsel. Counsel? May it please the court. My name is Bob Orson, and I represent – well, I think I'm the Rosemary, and the other side is Mike. I find it easier to keep track that way. The answer to your question, Your Honor, is the $25,000 was never paid. August 20, 2001, the contract that's on the appendix, page 103, was signed. Same date the deed was signed, August 20, 2001. Do you concede that there was a valid – or do you concede there was a valid contract for deed? Yes. Okay. Okay, that's good. Okay. This record consisted, I think, of most of three days of testimony, and it was mostly Rosemary and Mike, a few other witnesses. So to paraphrase an in-vogue term, it's kind of a fact-rich environment. Lots of people said lots of things. It's clear that the property has been stories for decades, and John, who died and made Rosemary the widow, John and Rosemary had done business on this property, and then in 99, they sold a trailer park they owned for $10 million. They gave then the trailer sales company to Mike. Mike would say, well, that's no gift, because without the park to put the trailers on, they haven't called Mike in to live in. There's a lot of record with regard to the various transactions. Rosemary had to continue bailing Mike out and paid over half a billion bucks to get him out of trouble with risk floor plans. The point of all of that testimony is that the money always flowed from Rosemary and Mike. Mike never paid the $25,000. He claimed that there was an $8,000 payment, a check to Rosemary, a month before the contract was signed, and Rosemary explained, no, that was a repayment. She had loaned Mike some money so that he could finance sales so that they could go through and sell. They, meaning Mike and his wife, could go through and sell some trailers. So Mike, for years, apparently, claimed that he had paid the $25,000, actually $26,000 plus with an $8,000 check, and then these installments on the mortgage that he made in December of 2001 and the spring of 2002. In the record, Mike claims, yes, he paid, yes, it was these payments, no, this is what they were for, and it was very clear that he was a liar. He was trying to put together some transactions to account for and create a $25,000 payment to Rosemary. It didn't happen. Why would your client sign a deed over without receiving the $25,000? I mean, if that's part of the contract, I think… I have a couple of suspicions, but the records, she was asked several times on that, and at various times she said she thought it was supposed to be $250,000, she thought that Mike was bullying him, that he was a pest, that John at some point might have wanted Mike to get the property. Normally, at a closing, you give them a check, they give you a deed, everybody goes away, and that's it, right? Yes, Your Honor, the flaw with that transaction as applied to these facts is Mike never had the $25,000, so he couldn't pay. So, in view of the Rosemary putting together, in view of Rosemary making a mortgage with the Bank of Edwardsville on the same 12-acre lot on Fosterburg Road, just months after the contract, and going back to the earlier case, the case heard by Judge Mendelson rather than Judge Harrison, there may have been some effort between Rosemary and Mike to make it look like Mike was creditworthy, that he had the property so that he could borrow the money. That was one of the suggestions. I don't know. Mike operated a business out of that location from 1999 until 2004, thereabouts, and he didn't pay a rent. Rosemary, at the time of trial, was 83. I'm not… I can do the arithmetic to figure out how old she was when the contract was signed, but her husband was almost on his deathbed. He at least was largely an accountant and had a caregiver in the back bedroom. She's being pestered by Mike. I'm talking to you about what I think the facts are. I think that Judge Harrison was reasonable when he took the point of view that the contract was breached by Mike's failure to pay. Mike's claim that he paid when he didn't, and then it was no longer an enforceable contract. So in 2007, we don't have to worry about whether that's a reasonable period of time. But with regard to your role in this, I thought initially that the question for the appellate court is, is Judge Harrison's decision against the manifest way to the evidence? And there's plenty on the record to support Judge Harrison's decision. But then I found what was news to me that there are some cases that hold that when the only requested relief from the appellate court is a remand for the entry of an order granting specific performance, not a remand for a new trial. It's not manifest way to the evidence. In effect, it's a peddler. In Illinois Railway Museum v. Siegel, Country Mutual Insurance Company v. Murray, Your Honor, I think that the only reasonable supported decision would be to deny. Because there's plenty of evidence in this multi-volume, multi-day transcript of testimony. There are plenty of facts to support Judge Harrison. I think that's your only question. Are there facts? And there are. Thank you, Your Honor. Thank you, Counsel. Counsel? Trying to get your name out of here as fast as you can for lunch. Take your time. We're in no hurry. We could probably miss a few lunches and it would be fine. The appellate makes one statement, and I want to point it out. He agrees there's a valid contract. Because he agrees, we look at Schwindler. It says parties to a valid contract for the purchase of real estate are entitled to specific performance as a matter of right. So if there is a valid contract, which the court said, the trial court says there is a valid contract. There is no question from my point of view that I believe there's a valid contract. The appellate agrees with me that there's a valid contract. So as a matter of right, we are entitled to specific performance. The court in Charlotte Holdings talks about the object of courts of equity is to enforce rather than to invade contracts. And our courts have repeatedly held that courts of equity will enforce a valid contract for the sale of unique assets as a matter of right. So we believe because of the appellate's admission that we do have a valid contract. And we were ready, willing, and able. And that's what we pledged. Again, there's no evidence to the contrary that he couldn't perform this. In 2007, when we made the demand to close on this property where we will, you know, I believe it's up here. But there's a letter that says the day after trial from the 2007 case, it says, hey, you know, the court said we didn't pay it. We're ready, willing, and able. We'll tender $25,000. If we go to a title company and exchange, you give us a deed, we'll give you the $25,000. So, you know, we believe based upon that that specific performance should be granted. Now, if we look at the other arm that the Pelley raises or the defendant raises, in Exhibit 2 of the Pelley's brief, it shows the payments, the payments of $26,963. Yes, there was an $8,000 payment in July of 08. You know, that's why we believe that we paid it. Now, again, we're not disputing, we didn't appeal the 2007 decision. And so we have to follow, we have to look at the 2007 decision and follow that. But upon, you know, on inquiry, we were ready to perform as of 2007. There was no, nothing in the 2007 case that repudiated the contract. The court went as far as saying the validity of this contract is not before the court in 2007. So, you know, there was no request to repudiate the contract. There was no request on the contract, no issue with the contract. And, you know... At the time of the payment you just referenced, the $25,000, had the amount that Rosemary had put up to bail out Michael been repaid in full? By that point in time, the statute of limitations is wrong. That's not what I asked. Had it been paid in full? Had the $250,000 been paid in full? Yes. I'm sorry. No. The $250,000. But, you know, if you look at the trial testimony, that $250,000 was not to bail out Michael. It's to bail out Rosemary, John, and Michael. Okay. So if... But, Mike, whoever was to bail out, whether it had been paid in full and it had not? I agree with you, but it's important to note that it's not just Michael. It's not just John. It's also for Rosemary. So Rosemary is on the hook just as much as Michael is. And in all actuality, from the testimony, Michael says that's their responsibility. I'm sorry? It's their responsibility. So it's Rosemary's responsibility. It's not Michael's. I appreciate it. Thank you so much. Well, we appreciate your briefs and arguments, both of you. And we'll take the case under advisement forward from the brief testimony.